Our third case is a consolidation of two appeals, 22-29-94 and 23-14-61, the United States v. Sean Connolly and Christopher Yates. Mr. Simpson, can you hear us okay from the courtroom? Yes, I can, Your Honor. Thank you. Ms. Wood, can you say something to test it from your end? Sure. Good morning, Mr. Simpson. I have a little trouble hearing counsel, but I definitely hear Your Honor's very well. Okay, so let me ask Ms. Wood to speak up as best she can and we'll proceed. Mr. Simpson, if for some reason you can't hear, just wave your hand. All right. Thank you very much, Your Honor. Okay. Good morning, Your Honors, and may it please the Court. My name is Lisa Wood and I represent Sean Connolly. This appeal raises two issues. First, whether the District Court relied on unreliable evidence in calculating the total drug weight attributable to Mr. Connolly. And second, whether the District Court erred in concluding that the total drug weight of the conspiracy was foreseeable to Mr. Connolly. Unless the Court has questions, I plan to focus on the first issue, whether the Court relied on unreliable evidence in determining drug weight. Are you attacking anyone other than Reckheimer and Phelps? Judge, I'm not attacking anyone else's statements. However, I don't think the other statements and the other evidence that the judge relied on in determining that Reckheimer and Phelps' statements were corroborated is actually corroborating. What the District Court relied on were the controlled buys and seizures, which amounted to 141 grams and change of methamphetamine. But the problem with this was that there was no evidence that these seizures and these controlled buys were representative of the drug sale activity that occurred throughout the entire course of the conspiracy. So is anything, maybe this is the other argument, I apologize, is what I'm worried about with the overall briefing here is whether anything less than testing every last gram of seized methamphetamine would suffice in this world where we have different sentencing for mixtures and for, you know, can ice on up. Judge, I believe that that is Mr. Yates' argument. Yeah, okay. I'll leave that alone then. Here, you know, I think the problem is we're talking about defense counsel advocated for, I believe, a level 32, which was, I believe, between 150 and 500 grams of methamphetamine. The government advocated for level 34, I believe, which was 500 grams to 1.5 kilograms. And the PSR placed the drug amount at about 700 grams. So we're not talking about a huge difference here. But Mr. Connolly, I mean, it's very much, or at least there was evidence that Mr. Connolly was very much involved with this. He helps, you know, hide methamphetamine from law enforcement. He has that phone call. He sometimes distributes from his house. I mean, there's a lot of evidence that someone could rely on to make all of this reasonably foreseeable to him. I think putting aside whether or not, you know, the entire weight of the conspiracy was reasonably foreseeable to him, if we look at Mr. Connolly's own actions, we're talking about controlled buys of drug amounts, you know, I believe they're under 10 grams or at least under 20 grams of methamphetamine. So he personally is not distributing a huge amount. But that doesn't matter, as you know, for purposes of the conspiracy and what he's held accountable for. Correct, Judge. Correct. And the district court here also relied on other co-conspirator statements, not just one wreck him or whose credibility you've challenged. So why wouldn't that be sufficient? I think it was Garland and Sealock, their testimony as well. Correct. Or statements. The problem with the other co-conspirator statements is that they essentially all talk about Christopher Yates and the amount of methamphetamine that he possessed because he was the one distributing it to the others. They testify, they talked about Mr. Connolly to some extent as well. To some extent, yes. And Yates is certainly a co-conspirator. Agreed. And I think everyone agrees that, you know, Yates was responsible, the amounts attributed to Yates were the bulk of the methamphetamine in this case. The problem with the other co-conspirator statements are that a lot of times they aren't tethered to a time period. But this is a preponderance standard. As you know, they don't have to be specific that on this date I saw X amount being sold. That's correct. But I think it's noteworthy that neither the district court nor the PSR relied on those other co-conspirator statements independently. The district court certainly said they corroborate Feltz and Reckhammer's statements, but they didn't, she did not say, you know, I'm attributing, you know, 50 grams of methamphetamine to, you know, person X's statement. And I think, I see my time is up, if I can answer your question briefly. You know, the fact that those statements are not tethered to a time period, there's a danger of double counting. There's a danger that they're vague. They don't contain a lot of details. And because of that, using them to corroborate the sort of more, you know, factually wholesome statements of Reckhammer and Feltz, whose credibility is questionable, I think was clear error. Okay. We'll give you that minute on rebuttal. I'm sorry? We'll give you your minute on rebuttal. Thank you, Judge. I appreciate that. You're welcome. Okay. Ms. Masters, good morning. Good morning, and may it please the Court. Mr. Simpson, you can hear me? Okay. Great. As the Court's aware, I represent Christopher Yates. Every defendant has a due process right to be sentenced based upon accurate and reliable information, and that did not happen here for Christopher, who was sentenced based upon the assumption that the entirety of the 737 grams of meth was pure. And there was no evidence to back that up. The tested amounts all came from the same week. There was no testimony or other evidence providing any basis for extrapolating those results to make reliable assumptions about purity over time, because the conspiracy lasted 13 months and had a change of suppliers. But Ms. Masters, this is not a case in which we just have one test of one by and that's that. The district court imposes some tests on herself. And she says, well, there are three different transactions, and they're for varying amounts, and so there's no reason to think that in large quantities it's ice and in small quantities it's mixtures or it's pure or actual, as we call it. So she tests it in a number of different ways. It's just not as many ways as you want, and that's why I was alluding before. I'm very concerned about the idea that unless you test every last gram, you have to default back to the mixtures arrangement, as opposed to what we seem to have acknowledged before, that you can have sampling. And she does think that this is a valid sample. So, Your Honor, the issue with what the district court did here is no one came to court and said any of these factors are reliable ones upon which to extrapolate for a conspiracy that lasts 13 months and has a change in supplier. So to your point, there could perhaps be a basis of extrapolation. That is the door that was left open by Carmel. But what happens here is the government just came in and didn't present evidence on that. The government came in and said we're not presenting evidence at sentencing. We're just making an argument, and the government's argument is one it now disavows on appeal. It agrees it was invalid, the argument that everybody knows in 2022 most of the mess circulating from cartels is pure. The conspiracy was in 2019. And so fundamentally there was no evidence here presented by anybody. No witnesses came in and said you can look at these factors, and from these factors you can extrapolate. It sounds like maybe you're backing off a little bit of your argument that everything needs to be tested if you're agreeing that there could be a basis for extrapolation. What we are agreeing to is the court left that door open in Carmel. And so we do think that the law should be, everything should be tested. How would that be consistent with preponderance of the evidence? Because there is no other way to determine purity over time. But how could you even run a system that way? That would certainly preclude holding somebody responsible for drugs that you got testimony about at the sentencing phase. Somebody coming in saying, oh, and we sold another 500 grams when the actual drugs weren't there. It would mean that the only thing that you could rely on was actual physical possession of drugs that are actually tested. Your Honor, I think this court has drawn distinctions, though, between purity and quantity, which is exactly what's happened in this case. But if you just have testimony about 500 grams, that's quantity, I understand. But your rule would require you to assume that those 500 grams were mixtures because you can't test them. And it wouldn't even be a rebuttable presumption because, based on your argument, you could never test those. Well, Your Honor, our point is that really in this particular case, you don't even have to go that far and resolve that issue because the government hasn't come up with evidence of an alternative theory. And unless and until it does, yes, it should all be tested because that is the plain language. So if you change this fact pattern, you don't have to go anywhere near as far as the point you made in your brief, I don't think. If you change this fact pattern and you say Mr. Yates admitted, I know this is hypothetical, in a post-arrest statement, he admitted and stands by the admission that he only sold pure methamphetamine. He only sold and dealt in ice. It would be very difficult to argue then in sentencing that the problem on purity was there's no testing of a more meaningful portion of the drug quantity, right? I would agree with that. Right. So it can't possibly be that testing is required. That's an extreme example, I know. But it can't possibly be that testing is required in all cases or complete testing in all cases. It very much depends on the facts and circumstances. I would go so far as to say in that particular circumstance you've given, yes, but for a variety of evidentiary issues. No, I know that's not this case. Against interest. But I think the reason you're getting that question is we have to be very careful about chiseling into stone a rule that says in methamphetamine cases 100% of the relevant quantity needs to be tested. We've never said that in the drug court. Right. Why would we ever say that? Well, the reason you would say that is because the statute, because of the due process issues here, that defendants are entitled to be sentenced. Even in a case where the next case involving John Doe where Mr. Doe admits that he only and always dealt in pure methamphetamine. Your Honor, I think I would have to concede that in that case you might need to be Right. So we have a line drawing question and you're making a fair point that, hey, all we have is one week here. It's a 13-month conspiracy. There was a supplier change. That's all you have to argue. You don't have to ask us to chisel anything into stone, do you?  And to have you affirm because the government came in at sentencing and just made an argument without any evidence and it wasn't reliable. You don't mean affirm, I think. Reliable. Well, we'll see. We'll give you your rebuttal time. Mr. Simpson, I'm sure, has a different perspective on it. Let's hear that. Thank you. Okay. Thank you, Your Honors. May it please the Court, I'm Scott Simpson on behalf of the United States. I'll address Mr. Connolly's challenges first since they relate to the amount of methamphetamine. Logically address that first and then I'll talk about Mr. Yates' challenge to the purity. There is certainly no clear error in the district court's finding that the conspiracy was responsible for at least 500 grams of methamphetamine needed to reach base offense level 34. The district court, of course, only needs to estimate the amount of drugs handled by a conspiracy. And it's not an exact science as this court has said. All the information here was consistent with at least exceeding the 500 grand threshold. That is the statements of Phelps and Reckemer that the probation office rely on. The supporting statements of other co-conspirators and the controlled purchase or seizure of about one-third of those 500 grams from six different members of the conspiracy over 10 different occasions. If the court looks, and I won't set out all of these numbers, but if the court looks at the statements by Gerald Boyarin, G-U-A-R-I-N, another conspirator, and Trenton Seelock, those statements, even considering them in a very conservative fashion, amount to way over, in fact, way over 500 grams. So there's far more, there's far from any basis for a definite and firm conviction that the district court got it wrong on the amount of methamphetamine. And by the same token, all of the evidence supports attributing at least that 500 grand threshold to Mr. Connolly. This was clearly a jointly undertaken criminal activity, and at least that amount was within the scope of the activity and reasonably foreseeable to Mr. Connolly. He helped plan the conspiracy's activities. He allowed conspiracy members to use his home to sell methamphetamine. He instructed conspiracy members on sending money to the leader, Christopher Yates, and he hid another member's methamphetamine, and that person was arrested. This is an easy case on the amount and on attributing it to Mr. Connolly. So now on the purity of the conspiracy's methamphetamine. On this issue, the standard is even more favorable to the government. In the district court, the government has to establish the purity by at least a preponderance of the reliable evidence, and this court, of course, reviews that finding for an abuse of discretion. All right, so Mr. Simpson, I'm looking at pages, depends which page numbers you want to use, but A31 through about A34 in the appendix to Mr. Yates' brief, which is where the district court, it's the part of the sentencing transcript where the district court concludes that this, these September 19, 2021 purchases are a representative sample of the 737 grams of ice, and what I can't find, there's certainly plenty of testing going on there, but what is it that justifies the inference that this one week in September was the same as the entire rest of the time for purposes of the type of, or the purity of the drug, it's all methamphetamine, for the purity? It seems like it just sort of comes out of thin air, or maybe what the district court, that, oh, everybody knows that people are turning to ice or even actual methamphetamine, but that's awfully touchy-feely. It doesn't seem like even some evidence that allows the inference. Your Honor, there's several answers to that. Several different circumstances support the finding that those testings are representative of what the conspiracy handled, but I think the district judge relied on these circumstances in finding . . . Right. That's what I'm looking at in this segment. Page A32, she says, I'm finding that it's accurate for the following reasons, not just one individual and one average quantity. There are three individuals. There are varying amounts, as low as 2.9 and as high as 110. She says they don't seem to be cutting it down. It was still pure at the eight ball quantity or approximately 2.9. That's where she puts it out, but I don't see what fact in there tells you that this group was specializing in particularly pure methamphetamine. Your Honor, that's a finding, that's a holding for the court to make, whether that's representative . . . What's the evidence that supports it? Judges don't just kind of get to come out here and say, well, I've decided to find this. There has to be evidence. I understand that, Your Honor. Of course, all of those things that the district court lists there are evidence. Another fact is that the tested methamphetamine totaled about 28% of the I'm not sure the court referred to this just now, but I believe the district court also referred to the fact that the conspiracy used a single source of methamphetamine throughout most of its . . . But there was evidence that that's not correct. There was evidence that the supplier changed during the course of the conspiracy. During the course, yes, Your Honor. What I was going to say is that the conspiracy used a single source during most of its existence. I believe the dates are that the conspiracy went from February of one year until January of the following year. It wasn't until December of that first year that the source changed because the source was arrested. So for the vast, the vast majority of those months, they were using that single source. So all of these tests come from one week out of 56 weeks. Come back to Judge Wood's question. What is the link that the purity from the one week can be the same even by a preponderance of the evidence for the other 55 weeks? There's no expert testimony. The usual things that we see and rely on aren't here. Your Honor, and this gets into referring to the court's earlier decisions in Castaneda and Carnell, which I'll refer to. But another fact, another piece of evidence that we have here is that at least two members of the conspiracy told law enforcement authorities that the conspiracy's product was ice methamphetamine. Now true, this court's decision in Carnell says that statements by co-conspirators are insufficient without more to establish purity. But here we have much more. Again, we have all of these- I don't see the much more. I guess that's what I'm trying to, and I think Judge Wood is trying to get that from you as well. What is the much more other than three tests during one week of a 56-week conspiracy and two members saying they sold ice? Your Honor, I may have misspoken. I think the testing was done on five different seizures. But all from the same week. Correct, all from the same week. Which suggests they came from the same group, the same distribution. I'm sorry, from the same- It suggests since they were tested the same week that it came from the same supply. That's possible, Your Honor, but the district court didn't make any finding in that regard. Exactly. But, Your Honor, since the seizures were made from three different members of the conspiracy, the different seizures could well have come from different deliveries that Mr. Yates made from his supplier. If a defendant made that argument, the government would be criticizing it as pure speculation. Nothing tells you. We know there are three individuals and we know the time during which these tests took place, this one week in September. But there's just an absence of evidence about where these people got their drugs from. That's correct, Your Honor. But I need to point out as well, let me pull up the table that's in our brief on pages 9 and 10 that talks about the different seizures and the amounts. Right. We can look at the fact that those tested amounts were all seized within one week's time. But looking at the amounts of those seizures, one of them was 110 grams, one of them was 17 grams, and there's some smaller ones. And the district court mentions that fact. I know. So all of those add up, the amounts that were tested, even though admittedly they were seized in one week, all of that because of the large size of the amounts, all of them add up to 28% of the 500 grams needed to reach base offense level 34. And we submit that besides the fact that you have that large percentage, 28%, all of these other facts add up to sufficient evidence of the purity. If I could, I notice my time has expired. Could I just address for a moment the other side's argument that all of the testing, that all of the drugs should be tested? You can, but I think Ms. Masters backed off that. Okay. You have a brief comment to make. Go ahead. That certainly cannot be the law. That would limit a finding of ice or actual methamphetamine only to seize drugs and controlled purchases. I think the court recognizes that. Mr. Simpson, before we let you go, can I ask a question? How do you know that the source changed? What do you rely upon to say the source changed in December of 2019? I don't know that it makes much difference, but where does that end the record? I couldn't figure out when the source changed. In fact, we looked in the record, and we couldn't figure out much about the source. There was a source, but then the source changed. Your Honor, I know it's in there, and I wish I could find it very quickly. All right. If you find it and want to send us a letter, you can. I'm going to ask Ms. Masters the same question. Certainly, I will do that, Your Honor. That's a very good question. I will do that. Your Honor, for all these reasons, we would urge the court to affirm in all respects. Thank you. Mr. Simpson, thanks to you. Ms. Wood, we'll give you a minute, and then Ms. Masters will give you the same. Thank you, Judge. I just want to point out that Mr. Connolly's situation is similar to the situation this court looked at in United States v. Dollar, where it was clear that the scope of the defendant's drug dealings extended beyond the amount he personally distributed or even perhaps beyond the amount required for the mandatory minimum finding. In that case, the court held that the fact that other drug sales were made did not corroborate the specific estimates of drug quantity provided by either of the two unreliable statements in that case. I think the same is true here. The fact that there may have been or there were sales beyond the 50-gram, and I think we would admit beyond 50 grams or perhaps even beyond 150 grams of drug. The fact that there were sales also exceeded beyond 500 grams. For that reason and for all the other reasons, we would ask that the court reverse. Thank you. Thanks to you. Your Honor, I'm going to begin with the answer to your question, Judge Scudder, about when the supplier changed. The only reference in the PSR is found on paragraph 28, and it's an interview. It's also cited in page 4 of our brief, an interview with one of the co-defendants who said that on December 11th of 2019, Christopher had informed her that his supplier had recently gotten arrested. Okay. Thank you. I want to just address briefly the issue about the percentages that Mr. Simpson raises because he's talking about the tested amounts represent 28% to get to the 500 for the sentencing level, but of course, that doesn't give you anything about extrapolating to get up to 500, which is the whole issue here. There's no evidence. The government just simply didn't put on a case here, and that's why we're asking, similar to Gibbs, similar to Noble, for a limited remand to just be sentenced and not a do-over because they just didn't put on a case, and it's always been involved that the government has to come in with evidence to support its theory and to support the results, and it didn't do that here. What would be competent evidence in your opinion? Excuse me if I could just ask the one question. Would it be enough if, aside from the admission hypothetical that Judge Scudder has posed, suppose the government came in from evidence of users of this methamphetamine over the year, and somebody testifies, you know, I got the best ice I've ever had from the Yates conspiracy, or they say something like that? In other words, could anecdotal evidence supply this gap in addition to actual chemistry lab testing? So, Your Honor, to be frank, I think that's really the point of our argument is the government has to come in with something. If they want to come in with that. Well, with something, I understand. I'm just trying to figure out how realistic a scenario we are being asked to consider. I think it's realistic for sure if we look at cases like that we cited, like Houston and like Dinn case, to come in and say here's a theory of extrapolation. And the point I would make to Your Honor's question is the government has not come in and said there is no theory of extrapolation. What they did is they just came in and said, well, you can all just assume that it comes from the Mexicans, and the Mexicans all are producing pure meth. I mean, if they had some reason to back that up, then put it in the court, and then the court can decide these bigger questions. Would you agree if an expert came in and said that that might be enough to satisfy the preponderance? That this all came directly from Mexico. I've been involved in reviewing drug trade cases, and everything I have seen coming from this place in Mexico is 100% pure. What I would agree at this point is that the government, if the government came in and did that and was willing to stand up on appeal and defend it, we would have a really different situation than the government putting on no evidence. And they just didn't do that, right? They didn't put on a case. I think your question probably gets at all of the hypothetical possibilities here, and that would be for the government to establish a record on and come up on appeal and defend it. So for the reasons set forth in our brief and those here today, we'd ask for a really limited remand in which only the tested amounts are considered pure and the bulk of the remaining 737 is considered the mixture. Thank you. Ms. Masters, thanks to you. Ms. Wood, thanks to you. If I understand correctly, you both took the case on appointment from the court. We very much appreciate that as part of service to the court and to your clients. Mr. Simpson, as always, thanks to you. And the government will take these two appeals under advisement.